AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Northern District of Oklahoma

**FILED**
OCT 24 2019
Mark C. McCartt, Clerk
U.S. DISTRICT COURT

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
The property to be searched is located at 206 S. River, Commerce, Oklahoma, including any and all storage structures on the property, which are located in the Northern District of Oklahoma. Further Described in Attachment A

Case No. 19-mj-221-FHM

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A"

located in the  Northern  District of  Oklahoma , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Possession With Intent to Manufacture, Distribute, or Dispense a Controlled Substances |

The application is based on these facts:

**See Affidavit of TFO Justin D. Oxford, FBI, attached hereto.**

☒ Continued on the attached sheet.
☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

TFO Justin D. Oxford, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10-24-19

*Judge's signature*

City and state: Tulsa, OK

U.S. Magistrate Judge Frank H. McCarthy
*Printed name and title*

# UNITED STATES OF AMERICA
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

## AFFIDAVIT

I, the undersigned, being duly sworn, depose and say as follows:

1. I am an Officer with the Tulsa Police Department, and as such, I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I have received a Special Deputation from the United States Marshall Service on April 30, 2019 and am assigned to the Federal Bureau of Investigation (FBI) as a Task Force Officer (TFO). I am currently employed as a Tulsa Police Corporal with the Tulsa Police Department and have been so employed since July of 2012. In December 2016, I reported to the Tulsa Police Departments Special Investigations Division, at which time was assigned to investigate Vice related crimes including but not limited to violent crime, and other state and federal crimes not listed.

2. Since becoming a Tulsa Police Officer, I have become familiar with, and have participated in a wide range of, methods of investigation, including, but not limited to, use of physical surveillance, witness interviews, search warrants, arrest warrants, debriefings and operational use of informants, pen registers, surveillance of undercover transactions, consensually monitored and recorded conversations and phone calls, the introduction of undercover officers, and reviews of recorded conversations. Additionally, I have participated in investigations that utilized the interception of wire and electronic communications (Title III) and have monitored/minimized numerous calls during these investigations. Through training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored,

and distributed and the methods of payment for such drugs. I have received numerous hours in training from various federal, state, and local law enforcement agencies.

3. I have authored affidavits for search and arrest warrants, Participated in Title III investigations, listened to intercepted phone calls, and have participated in the use of undercover operations for the purchase and distribution of illegal substances. I have participated in the execution of numerous controlled deliveries of narcotics. As a result of my law enforcement service, I have gained a considerable amount of knowledge through both training and experience. I have interviewed numerous defendants involved in the use, manufacture, transportation, and illegal sale of controlled dangerous substances. During the course of these interviews, I have inquired and learned how individuals involved in drug distribution schemes and networks use and disperse the illegal proceeds generated due to the illegal sale of controlled dangerous substances, including but not limited to chemicals commonly utilized in the illegal manufacturing and distribution of methamphetamine, cocaine and heroin. During the course of my training and interviews with various defendants, I have learned how individuals involved in drug distribution schemes maintain records and conspire to deceive law enforcement, as well as, rival distributors of controlled dangerous substances. I have learned how individuals that are involved in the distribution of controlled dangerous substances maintain records and secret monies gained as a result of participation in illegal drug distribution networks. The information contained in this affidavit is known personally by me and/or was learned from information received from other officers or agents and/or by reviewing reports and documents affiliated with this investigation.

4. The information set forth in this affidavit is known to me both through my investigation and from other information provided to me by other sworn law enforcement

personnel. Because this affidavit is being submitted for the limited purpose of securing a Search Warrant, I have not included each and every fact known to me concerning this investigation. I set forth only the facts that I believe is necessary for the issuance of a Search Warrant for 206 S. River, Commerce, Oklahoma (which is further described in "Attachment B" of this Affidavit), because there is now evidence, fruits and instrumentalities, listed on Attachment "A" of this Affidavit, showing Julio Cesar Gonzalez was engaged in a continuing Conspiracy in violation of Title 21, USC § 841, Knowingly and Intentionally Manufacture, Distribute, Dispense, or Possess with Intent to Manufacture, Distribute, or Dispense a Controlled Substance.

5. The United States government, including Special Agents of the Drug Enforcement Agency and officers of the Tulsa Police Department Special Investigations Division are investigating the suspected illegal drug trafficking activities of Julio Cesar Gonzalez including violations of 21 U.S.C. § 841(a)(1). Officers and agents determined that Julio Cesar Gonzalez has been documented in numerous federal enforcement agency reports of investigation, is a known distributor of narcotics.

6. In June 2019, a joint narcotics investigation led by the Federal Bureau of Investigation's Oklahoma Safe Streets Task Force, conducted a controlled purchase of crystal methamphetamine in Northeastern Oklahoma. Over the next several months, agents determined illegal narcotics were being trafficked from Oklahoma City to Northeastern Oklahoma by an unknown Hispanic male based out of Commerce, Oklahoma. Surveillance personnel identified numerous residences and vehicles associated with the suspect, to include: a house located at 311 S. Cherry St., Commerce, Oklahoma; the GardenWalk of Commerce Apartment Complex, Commerce, Oklahoma; a silver Hyundai Sonata; and a white Chrysler 300.

7. On Friday October 18, 2019, surveillance personnel observed the suspect and an unknown female in a silver Hyundai Sonata travel from Commerce Oklahoma to a parking lot near SW 44th St. and S. May Ave in Oklahoma City, Oklahoma. This area is known by law enforcement agencies to be frequented by drug trafficking organizations (DTOs) for the purposes of distributing illegal narcotics. The vehicle remained in the parking lot in excess of three hours without moving, and was then observed leaving Oklahoma City, Oklahoma heading eastbound back toward Commerce, Oklahoma. Due to the fact surveillance personnel did not observe anyone approach the vehicle and or its occupants exit for any other reason than to eat lunch, it was assumed the suspect was unable to make a pick-up.

8. On Sunday, October 20, 2019, corroborated information indicated the unknown Hispanic male was traveling to Oklahoma City, presumably to pick up the shipment of illegal narcotics he was unable to obtain on Friday, October 18, 2019. At approximately 1600, surveillance personnel traveling eastbound on the Will Rogers turnpike identified a white Chrysler 300 being driven by a Hispanic female with a Hispanic male in the passenger seat. The vehicle bore Oklahoma license plate JQC-267, and checked to a Sochil Aguilar out of Commerce, Oklahoma. The address listed was a P.O. Box, however the name Aguilar was also tied to the Silver Hyundai and 311 S. Cherry St., Commerce, OK, previously associated with the suspect.

9. At approximately 1630, agents provided Oklahoma Highway Patrol a description of the vehicle and notified them of the potential it could be trafficking illegal narcotics. At approximately 1700, Trooper Trent Short of the Oklahoma Highway Patrol conducted a routine traffic stop for an unsafe lane change (failed to signal) of the white Chrysler 300 near eastbound mile marker 286 of the Will Rogers Turnpike. Trooper Steve Hamilton also arrived on scene

4

shortly after the stop in order to offer his assistance. During his initial interaction with the occupants, Trooper Short noticed the occupants displayed indicators of criminal activity including rapid breathing and increased heart rates, beyond normal nervous behaviors. Based on these non-verbal signs, coupled with the information recently provided by agents, Trooper Short and Trooper Hamilton removed the occupants from the vehicle and deployed a narcotics K9 named Mack. Mack had a distinct change in behavior when he approached the driver's side of the vehicle, alerting to the possible presence of illegal narcotics. A probable cause search was subsequently completed, during which time 4 gallon-size bags containing a crystal-like substance were discovered behind the driver's seat on the floor boards.

10. Both occupants, Sochil Aguilar (driver) and Julio Gonzalez (passenger) were taken into custody and placed in Craig County Jail on suspicion of aggravated trafficking crystal-meth. The substance field tested positive for methamphetamine, and in total weighed more than 4000g.

11. On October 23, 2019, TFO Spurlock and I interviewed Sonchil Aguilar at the Craig County Jail. Sonchil Aguilar stated post Miranda, she was contacted by her sister's boyfriend, Julio Cesar Gonzalez who asked her to drive him to Oklahoma City on October 20, 2019. Sonchil Aguilar agreed to drive Julio Cesar Gonzalez to Oklahoma City for $200.00 and gas money. On October 20, 2019 Sonchil Aguilar did in fact drive Julio Cesar Gonzalez to a Morelos Mexican grocery store in Oklahoma City. Julio Cesar Gonzalez got out of the vehicle and met with another person. Sonchil Aguilar stated she did not know Julio Cesar Gonzalez was purchasing a large amount of methamphetamine and kept her head down during the meeting and did not see the other party. Sonchil Aguilar stated Julio Cesar Gonzalez returned to the vehicle a short time later and put something behind the seat. Sonchil Aguilar stated she did not know what Julio Cesar Gonzalez

put behind the seat until she was stopped by the Oklahoma Highway Patrol and Troopers searched her vehicle. Sonchil Aguilar confirmed Julio Cesar Gonzalez lives in Commerce, Oklahoma.

12. Julio Gonzalez listed 206 S. River in Commerce, Oklahoma as his home address on booking paperwork at the Craig County Jail.

13. DEA TFO Joey Stites has conducted surveillance at the 206 S. River address in Commerce, Oklahoma, and has seen Julio Gonzalez at the residence.

## CONCLUSION

14. During the course of my training and experience, I have participated in numerous search warrants at the residences of individuals who are members of violent street gangs and/or engage in the distribution of illegal drugs.

15. Additionally, in the course of my training and experience, I have learned that individuals who manage and are responsible for large amounts of illegal drugs that is meant for distribution and large sums of money which is proceeds from the sales of illegal drugs or future payment for a supply of drugs, often possess firearms. I have learned that the managers or directors who are responsible for large supplies of illegal drugs or large amounts of money possess firearms in order to protect themselves, the organizations money and drugs in an effort to deter others from robbing them.

16. I have also learned that a manager or director of an illegal drug trafficking organization may frequently possess and/or use firearms in order to harm, intimidate and/or coerce individuals to collect drug proceeds owed to the organization or to deter competitive efforts by other individuals or organizations that also traffic illegal drugs.

17. During my experience, I have assisted in the execution of search warrants at the

residences and places of business of individuals who direct and/or manage illegal drug trafficking organizations. During these searches, I have that learned individuals responsible for directing the activities of an illegal drug trafficking organization rely on the use of equipment or "tools of the trade" in order to operate the organization efficiently. These "tools of the trade" frequently include computers, cellular telephones, notes and/or ledgers recording information, indicates the identities of other involved co-conspirators and methods of money laundering and firearms. In the prior cases, documentation found in notes, ledgers, documents in computers and cellular phones were found to contain evidence identifying the rightful owner of the devices, history of communication and records relating to criminal activities and involvement in criminal activity.

18. I know from my training and experience that searches and seizures of evidence, from computers and cellular phones require agents to seize most or all items (hardware, software, passwords and instructions) to be processed later by a qualified computer expert in a laboratory or other controlled environment. Computer storage media which can be accessed by cellular phones or other devices to store or retrieve data can store the equivalent of thousands of pages of information. This storage medium includes but is not limited to flash memory cards, compact flash cards and other similar storage medium, USB mini storage devices, micro hard drives, external hard drives internal hard drives, and optical or mechanical storage.

19. I know from my training and experiences that searching computers and cellular phones, for criminal evidence requires experience in the computer field and a properly controlled environment in order to protect the integrity of the evidence and recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (from external sources or from destructive code imbedded

in the system as a "booby trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis. Other assisting investigators or I from the FBI and Tulsa Police Department may however conduct a preview examination of the suspect's computer and cellular phone on-site using hardware and software that will not alter or change any potential evidence located on the said items.

20. Based on my training and experience, I know that computer and cell phones can contain a substantial amount of information relevant to the investigation of a case. Criminals often use computers and cellular phones to communicate with accomplices and will sometimes store accomplices' contact information in address books, speed dial lists or in other areas of the phone. These communications can occur through typical telephone calls or through instant messaging or text messages. To the extent that criminals use services such as instant messaging or text messages, these messages can sometimes be found on the cellular phone itself. Further, criminals also use cellular phones to document criminal activities both by photographs, videos as well as digital memos. I know that these images and memos are also stored on the handset itself. Also, information can be located on the SIM (Subscriber Identity Module) which is a smart card located in the phone which also contains network information. Removable memories, such as but not limited to, flash cards, are also sometimes located in a cellular handset that allows the user to store vast amounts of electronic data.

21. I know that devices such as these computers and phones can store large amounts of information such as: phone numbers and call history and some mobile phones can also contain contact information and calendar information and can be linked, either by wire or wireless, with computers. Camera phones can contain images. This information can be valuable evidence in

determining other participants in a criminal enterprise and it is evidence that is typically maintained for long periods of time.

22. Likewise, I know that images contained in a cellular telephone taken with the device's camera function can contain evidence of where a subject has been and with whom the subject has associated and that these images are stored for long periods of time.

23. I know from my training and experience that search warrants of computers and cellular phones involved in a criminal offense usually produces items that would tend to establish ownership or use of cellular phones and ownership or use of any Internet service accounts, to include credit card bills, telephone bills, correspondence and other identification documents.

24. Based upon the foregoing information, I respectfully submit that there is probable cause to believe that at the addresses of:

- 206 S. River, Commerce, Oklahoma, Attachment B

(which are further described in Attachment "B" of this Affidavit) there is now evidence, fruits and instrumentalities, listed on Attachment "A" of this Affidavit, showing Julio Cesar Gonzalez is engaged in a continuing Conspiracy in violation of Title 21, USC § 846 and Knowingly and Intentionally Manufacture, Distribute, Dispense, or Possess with Intent to Manufacture, Distribute, or Dispense a Controlled Substance in violation of Title 21 USC § 841.

TFO Justin D. Oxford - Affiant

Subscribed and sworn to before me this 24th day of October 2019.

United States Magistrate Judge

## ATTACHMENT "A"

## DESCRIPTION OF PROPERTY TO BE SEARCHED
206 S. River, Commerce, Oklahoma



The property to be searched is located at 206 S. River, Commerce, Oklahoma, including any and all storage structures on the property, which are located in the Northern District of Oklahoma. The residence is a single story house with light blue vinyl siding and gray composite shingled roof. The residence is east facing and on the west side of the street. The numbers "206" are displayed north of the front door above a black mail box attached to the residence. The residence has a metal car port attached to the south side of the residence. Specific descriptive details of the residence are depicted in the attached photograph.

# ATTACHMENT B – ITEMS TO BE SEIZED

Definitions: The terms "records," "documentation," and "materials" include all of the following items of evidence in whatever form and by whatever means such records, documents, or materials, their drafts, or their modifications may have been created or stored, including (but not limited to) any handmade form (such as writing, drawing, painting, with any implement on any surface, directly or indirectly), any photographic form (such as microfilm, microfiche, prints, photocopies, electronically stored images), any mechanical form (such as information on an electronic, or magnetic storage device, such as floppy diskettes, backup tapes, CD-ROMs, optical discs, or smart cards, as well as printouts or readouts from any magnetic storage device). The term "documentation" shall include the content of electronic communications in electronic storage within the meaning of 18 U.S.C. § 2703(a).

1. Drugs and associated paraphernalia such as packaging and scales used in the distribution, concealment, sale, use and/or transport of the product.

2. Firearms.

3. Ammunition.

4. All documentation showing the receipt, storage, manufacturing, purchase, and or use of items used in the commission of criminal activities as described above.

5. All documentation establishing the identity of associates, customers, suppliers, manufacturers, or others engaging in the criminal activities as described above.

6. All financial documentation and account information depicting means of income, assets, and expenditures.

7. All documentation pertaining to travel.

8. Cellular and electronic devices used for transmitting messages via internet and or cellular network(s).

9. Digital, cellular, and/or telephone numbers and/or direct connect numbers, names and identities, including electronic mail addresses, usernames and passwords stored in the above listed cellular telephone devices and computers and in any other electronic media attached to or found with the devices, including but not limited to SIM cards and flash memory cards.